_____

No. 94-2691
_____

Angela Larson, a minor, by        *
Joseph and Gail Larson, her       *
father and mother and next        *
friends,                          *
                                  *
        Plaintiff - Appellant,    *
                                  *  Appeal from the United States
            v.                    *  District Court for the District
                                  *  of Nebraska.
Roger Miller; George Spilker;     *
Harvey Bulli; The Papillion-      *
LaVista School District, a        *
Political Subdivision,            *
                                  *
        Defendants - Appellees.   *

_____

        Submitted:  September 11, 1995

           Filed:  February 20, 1996

_____


Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, McMILLIAN,
     FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS
     SHEPPARD ARNOLD, and MURPHY, Circuit Judges, en banc.


HANSEN, Circuit Judge.

     Joseph and Gail Larson, individually and on behalf of their
daughter Angela, who was sexually abused by a school van driver,
brought suit against three school officials and the Papillion-
LaVista School District (PLSD).  The suit alleged a 42 U.S.C.
§ 1983 claim for violations of Angela's constitutional rights, a 42
U.S.C. § 1985(3) claim for injury arising from a conspiracy to
violate the Larsons' constitutional rights, and a pendent state
negligence claim.  The Larsons appeal the district court's[1] order

_____

     [1]The Honorable Lyle E. Strom, then Chief Judge of the United
States District Court for the District of Nebraska.

granting the school officials' and PLSD's posttrial motion for judgment as a matter of law on the Larsons' constitutional claims and dismissing their pendent state negligence claim.

A panel of this court initially affirmed the judgment on the § 1983 claim and reversed both the judgment on the § 1985(3) conspiracy claim and the dismissal of the pendent state negligence claim. We vacated the panel's opinion and granted the school officials' and PLSD's suggestion for rehearing en banc. We now affirm the judgment of the district court in all respects.

## I. BACKGROUND

Viewing the evidence and reasonable inferences from the evidence in the light most favorable to the party prevailing at trial, McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994), a jury could reasonably find the following facts. Angela Larson was born on December 3, 1979, and was diagnosed as anophthalmic in her left eye and microthalmic in her right eye, meaning she had no left eye and her right eye was extremely small. Because of Angela's disability, her family relocated to the Omaha metropolitan area in order to take advantage of Omaha's medical and special educational facilities. At age two, Angela began receiving home services arranged for her by George Spilker, PLSD's Director of Special Services. Those home services continued until she was five years old. When Angela reached kindergarten age, her school district, PLSD, contracted Angela's special educational services out to the Omaha Public Schools due to the severity of her impairment.

When Angela was nine years old and not progressing to her parents' satisfaction in her placement in the Omaha public schools, Mr. Spilker arranged for an outside vision consultant to observe and evaluate Angela. Mr. Spilker then arranged for her to begin attending District 66's Oakdale school, where Angela did quite well

2

in a special educational program devised in part by Mr. Spilker. The Larsons and Mr. Spilker lived in the same neighborhood and have known each other for years. Mr. Spilker has spent more than 25 years as an educator of special needs children, he supervises the education of over 600 special education students, and as indicated he has been personally involved in developing and implementing Angela's individual education plan since she was two years old.

Angela's parents dropped her off each morning at the Children's Corner Day Care Center, where she was transported in a PLSD van driven by a PLSD employee to Oakdale school. After school, a PLSD van would transport Angela back to the Children's Corner, where she waited for her parents. The only other student on the van was a severely and profoundly handicapped youth who possessed minimal communicative abilities. The van driver, Eugene Szynskie, had been a part-time PLSD employee for three years before he was hired as a van driver in 1986. Three PLSD supervisory personnel interviewed Szynskie when he was first hired but did not conduct a background check.

In the spring of 1988, Angela told her teacher, Jennie Grieb, that Szynskie had been asking her whether she had been breast fed and whether she was wearing silk panties. Ms. Grieb, a District 66 employee, promptly apprised Mr. Spilker of these inappropriate comments. Mr. Spilker passed this information on to Harvey Bulli, PLSD Director of Transportation, who in turn warned Szynskie not to engage in improper conversations with students. Szynskie continued to transport Angela to and from Oakdale without further complaint until January of 1989.

En route home from piano lessons on Thursday evening, January 26, 1989, Angela informed her mother that Szynskie had fondled her vaginal area while putting on her seat belt. On Friday morning, January 27, Mrs. Larson called Mr. Bulli, PLSD's Transportation Director and the van driver's supervisor, to tell him that Angela

would not be riding the van that day.  She did not tell Mr. Bulli why.  Mrs. Larson then called Mr. Carr, the principal of Angela's Oakdale School, and informed him of the touching incident.  Knowing that Mr. Spilker would be at a meeting in Lincoln, Nebraska, that day, Mr. Carr arranged for a colleague of his who was also attending the Lincoln meeting to relay Mrs. Larson's information to Mr. Spilker.

When Mr. Spilker returned to Omaha on Friday evening, he called Mrs. Larson, who informed him of Angela's complaint.  Mr. Spilker cautioned the Larsons about broadcasting the allegations, which he said might bring on a slander suit by the driver, and told the Larsons that the matter was a serious one which pitted Angela's word against the driver's.  Mr. Spilker indicated that bringing charges against Szynskie might also cause problems for the family and for Angela's brother, Eric, who was a sophomore at the local high school.  He told the Larsons that he would contact the local Chief of Police (also a neighbor).  He called Chief Engberg that night and, without divulging any names, discussed the matter in general terms.

On Monday morning, the PLSD superintendent, Roger Miller, held his regular staff conference at 9:00 a.m.  Mr. Spilker informed him of Angela's allegations and of the need for a criminal records check.  Mr. Miller gave orders that immediately removed Szynskie from his van driving job and assigned him to warehouse duty pending further investigation.  He also directed the assistant superintendent for personnel to provide Szynskie's name, date of birth, and social security number to the Chief of Police for a records check.  He told Mr. Spilker to tell the Larsons what was being done, and Mr. Spilker did so in a 9:30 a.m. phone call to

-4-

Mrs. Larson. Specifically, Mr. Spilker told Mrs. Larson that Szynskie had been taken off the van and that a criminal records check had been ordered. He reiterated that it was Angela's word against Szynskie's. Mr. Spilker called a second time on Monday to tell Mrs. Larson that the other van drivers had reported that Angela had made sexual comments to them. Mrs. Larson became irate and called her husband, who became "equally irate" (Trial Tr. at 380) when he learned of Spilker's second call. The Larsons concluded that "the tables were turning" on Angela (id. at 485) because she was a handicapped female who was making a complaint of sexual abuse.

Mrs. Larson called Mr. Spilker at home about 7:00 p.m. on Monday night to tell him that they would not be using the school van until the matter was settled. Mr. Spilker once again told her it was Angela's word against the driver's and that there was the risk of a slander suit by Szynskie. The Larsons then called their personal attorney who told them that the Nebraska child abuse reporting statute gave them protection from civil suits for reporting the matter to police authorities. The Larsons decided then to call the prosecuting authorities the next morning.

Early Tuesday morning, Mr. Larson called the Sarpy County Attorney's office. That office refused to take the complaint and told him to call the police. Mrs. Larson then called a local police officer whom she knew and made a report of the touching incident. The officer immediately deduced that the touching had occurred at a location outside of his jurisdiction, and he called

-5-

the sheriff's office, which sent investigators.[2]

While Mrs. Larson was reporting the matter to the police department on Tuesday morning, the PLSD was terminating Szynskie's employment. The Chief of Police had reported back that Szynskie had a previous arrest but no conviction for an alleged sexual assault on his stepdaughter. The Chief had also told the school authorities that the arrest information was confidential. Superintendent Miller instructed Mr. Spilker to tell the Larsons that the school had terminated the driver, that the police had done a records check (without revealing the results), and that the law enforcement authorities would have to prosecute the case, not the school district. Mr. Spilker did so.

Six months after the incident, Mr. Spilker asked Chief Engberg to approve a press release stating that PLSD had reported the alleged abuse on Friday, January 27, 1989. Engberg refused to approve the release, stating that, in his view, their conversation that night did not constitute a report.

Angela and her parents sued PLSD, Mr. Miller, Mr. Spilker, and Mr. Bulli, alleging that PLSD and the school officials deprived Angela of her civil rights, 42 U.S.C. § 1983, and conspired to deny Angela's and her family's civil rights, 42 U.S.C. § 1985(3). The complaint also included a pendent state negligence claim. After a trial on the Larsons' constitutional claims, the jury returned a verdict in favor of the Larsons, awarding $80,002 in compensatory

---

[2]About three weeks later, the state charged Szynskie with sexual abuse. Ultimately, a jury convicted him, and he was sentenced to jail for the crime.

damages and $395,001 in punitive damages.  The district court took the pendent negligence claim under submission, pursuant to Neb. Rev. Stat. § 13-907 (Reissue 1991) (requiring that such suits be heard by the court without a jury).

The defendants filed a timely posttrial motion for judgment notwithstanding the verdict or judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).[3]  The district court granted the motion, set aside the jury verdicts, and entered judgment in favor of the defendants on the constitutional claims.  The district court also entered judgment in favor of the defendants on the pendent state law tort claim, dismissing the Larsons' complaint.  The Larsons appeal.

## II. DISCUSSION

We review the district court's entry of judgment as a matter of law "in the light most favorable to the party who prevailed before the jury." City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651 (8th Cir. 1989).  This standard requires this court to:

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

---

[3]A motion for judgment as a matter of law now encompasses all motions labeled as motions for judgment notwithstanding the verdict or motions for a directed verdict.  Fed. R. Civ. P. 50 (subdiv. (a), cmt. to 1993 amend.).  Consequently, we will apply cases discussing the standard of review for a motion notwithstanding the verdict interchangeably with cases discussing motions for judgment as a matter of law.  McKnight, 36 F.3d at 1400 n.1.

Pumps and Power Co. v. Southern States Indus., 787 F.2d 1252, 1258 (8th Cir. 1986) (quotation omitted).  We are not, however, entitled to give a party "the benefit of unreasonable inferences, or those at war with the undisputed facts."  City of Omaha Employees Betterment Ass'n, 883 F.2d at 651.  "A mere scintilla of evidence is inadequate to support a verdict," and judgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict.  Id. at 651-52.

## A.   The Larsons' 42 U.S.C. § 1983 Claim.

Angela's § 1983[4] claim alleges that PLSD and the individual defendants denied Angela's civil rights by failing to receive, investigate, and act upon Angela's prior complaint and by failing to adequately train its employees in the prevention and reporting of the abuse of handicapped children.  We address each argument in turn.

### 1. Failure to Receive, Investigate, and Act.

The individual defendants are subject to personal liability under § 1983 for failure to adequately respond to the known risk of physical and emotional harm presented by Szynskie if the Larsons proved that the defendants:

> (1) Received notice of a pattern of unconstitutional acts committed by subordinates;

---

[4]42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

-8-

(2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

(3) Failed to take sufficient remedial action; and

(4) That such failure proximately caused injury to the child[].

Jane Doe A By and Through Jane Doe B v. Special Sch. Dist., 901 F.2d 642, 645 (8th Cir. 1990). PLSD, a local governmental entity, may be found liable for "a governmental custom of failing to receive, investigate and act upon complaints of sexual misconduct of its employees" if the Larsons proved the existence of an official custom of such conduct and if that custom caused them constitutional harm. Thelma D. by Dolores A. v. Board of Educ., 934 F.2d 929, 932 (8th Cir. 1991). To prove such a custom, the Larsons must show:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Jane Doe A, 901 F.2d at 646.

In its memorandum opinion, the district court concluded that, giving the Larsons the benefit of all reasonable inferences, "the evidence presented at trial simply does not suggest that any pattern of unconstitutional behavior existed and the verdict must be overturned against both the school district and the individual defendants." (Appellants' Addend. at 6.) We agree.

-9-

The Larsons can point only to one prior complaint regarding Szynskie's behavior toward Angela.  In previous § 1983 actions against school officials, we have held far more extensive records of unheeded prior complaints insufficient to constitute a pattern of unconstitutional behavior.  See Jane Doe A, 901 F.2d at 644, 646 (holding that receiving complaints over the course of two years of isolated incidents -- including that bus driver had used foul language, physically restrained and assaulted children, kissed a child, placed his hand down a boy's pants, and touched boys' crotches -- was insufficient to show persistent pattern of unconstitutional misconduct); Thelma D., 934 F.2d at 933 ("[F]ive complaints scattered over sixteen years cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct.").  Accordingly, we believe that the district court correctly found that there was no evidence of a pattern of unconstitutional behavior in this case.  Finding no widespread pattern of unconstitutional behavior, it is unnecessary for us to consider whether deliberate indifference existed or whether injury resulted.

## 2. Failure to Train.

To establish liability on the part of PLSD for its failure to adequately train its employees to report and to prevent the sexual abuse of handicapped children, the Larsons must prove that PLSD's "failure to train its employees in a relevant respect evidences a `deliberate indifference' to the rights of the students." Thelma D., 934 F.2d at 934 (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)).  The Larsons must prove that PLSD "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Id.  As the Larsons accurately point out, notice of a pattern of unconstitutional behavior need not be shown where the failure to train employees "is so likely to result in a violation of constitutional rights that the need for training is patently obvious." Id.

-10-

In this case, we find no evidence to support the Larsons' claim that PLSD employees received inadequate training. The evidence is uncontroverted that PLSD required its employees to report all suspected cases of child abuse to the proper jurisdictional law enforcement authority pursuant to Nebraska's rigid reporting statute. In addition, PLSD repeatedly held meetings between its employees and law enforcement officers from all five law enforcement agencies serving PLSD in order to enhance communication between PLSD and law enforcement, to develop strategies for reporting child abuse, and to determine how to follow up on reports of alleged child abuse. Faced with similar facts in Jane Doe A, this court found no evidence of "deliberate indifference to the rights of the handicapped children in the District's training program for bus drivers, teachers, supervisors, and bus aides." 901 F.2d at 646. We conclude that the Larsons have not produced sufficient evidence to support a § 1983 action based on PLSD's failure to train its employees.

**B.  The Larsons' 42 U.S.C. § 1985(3) Claim.**

The Larsons' § 1985(3) claim alleges that the individual defendants, animated by an invidiously discriminatory animus against handicapped females, conspired to deny the Larsons' rights under the First and Fourteenth Amendments by preventing them from reporting Angela's abuse. In order to prove the existence of a civil rights conspiracy under § 1985(3), the Larsons must prove: (1) that the defendants did "conspire," (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws," (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of the conspiracy," and (4) that another person was "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United

-11-

States."  42 U.S.C. § 1985(3).  See also City of Omaha Employees Betterment Ass'n, 883 F.2d at 652.

> The "purpose" element of the conspiracy requires that the plaintiff prove a class-based "invidiously discriminatory animus."  Moreover, the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.  She can satisfy this burden by "point[ing] to at least some facts which would suggest that appellees `reached an understanding' to violate [her] rights."

Id. (internal citations omitted) (alterations in original).

The jury returned special verdicts against Mr. Spilker and Mr. Miller, but the district court granted their posttrial motion for judgment as a matter of law.  The district court concluded that the Larsons had failed to present "any evidence from which the jury could infer that Spilker and Miller agreed to deprive the Larsons of their rights under the [F]irst or [F]ourteenth [A]mendments." (Appellants' Addend. at 7.)  The court also concluded, "Nor does the evidence support the jury's finding that Spilker and Miller were motivated by an invidiously discriminatory animus toward handicapped females."  (Id. at 7-8.)  Alternatively, the district court concluded that even if there were sufficient evidence to support the Larsons' conspiracy allegations, their claim was barred by the intracorporate conspiracy doctrine.

We find it difficult even to discern precisely what constitutional rights the Larsons contend that the alleged conspiracy deprived them of.  The only claim we can identify is that the Larsons allege a conspiracy to deprive them of their right as citizens to report the January 1989 incident.  (See Jury Instr. 17 & 19, Jt. App. Vol. I at 71, 73.)  We agree with the district court that, even giving the Larsons the benefit of every inference, the record in this case does not show that their ability or opportunity to report the incident to law enforcement was impeded

by any of the defendants in any significant way.

The Larsons first brought the incident to Oakdale (not PLSD) school officials' attention on Friday morning, and Mr. Spilker, having received the information thirdhand, contacted them as soon as he returned from his out-of-town meeting. Mr. Spilker's non-lawyer legal advice to the Larsons "not to go out on the streets and tell everybody" because "[y]ou will be sued for slander" by the van driver and "things like this could be hard on the family," as Angela's father recounted it (Trial Tr. at 376), or "that we cannot run out and start telling just anyone about this -- that we have to be very careful," as Mrs. Larson testified (Id. at 478), contained no advice not to report the matter to law enforcement authorities. Nebraska Revised Statute § 28-716 (Reissue 1989) provides for immunity from civil liability for reporting suspected child abuse, but this immunity extends only to persons who participate in an investigation of child abuse or who actually make a report to law enforcement authorities of suspected child abuse upon reasonable cause to believe a child has been subjected to abuse. The statute provides no protection for the kind of general publication of the allegations that Mr. Spilker warned might trigger a slander suit by Szynskie. Mr. Larson testified that Mr. Spilker told him to proceed with caution not only because of the risk of a slander suit but also because "this is tough for families and it could be tough for Eric [in high school]." (Trial Tr. at 376.) This statement, to the effect that making the incident public could cause difficulties for their son at the high school, might be stretched far enough to be construed as some sort of threat or intimidation. Nevertheless, we find it insufficient in itself to constitute a constitutional deprivation. Mr. Spilker expressly told the Larsons they were free to report the incident when he told them that the school district was not going to press the charges.

Both of the Larsons testified that they made no report themselves to law enforcement officials until Tuesday morning, and

-13-

that they had waited over the weekend to see what the school authorities would do. Mr. Larson testified that their main concern was that the accused driver not be permitted to be in contact with school children, a result accomplished the first thing Monday morning when Mr. Spilker informed Mr. Miller of the matter and Mr. Miller immediately ordered Szynskie off of van duty and into the warehouse. The Larsons decided to report the matter themselves after conferring with their attorney at about 9:00 p.m. on Monday night. They reported the incident to authorities on Tuesday morning. There simply is no evidence that the school officials deprived the Larsons of their opportunity to report the incident. Even if we were to assume that all of the four-day delay here was somehow caused by the school officials, the Larsons do not allege that any further injury occurred to Angela as a result of this delay. Thus, we conclude that any delay in reporting this incident does not rise to the level of a constitutional deprivation.

Even if the Larsons had demonstrated a constitutional violation, after carefully considering the entire record, we agree with the district court that there was simply inadequate evidence, either direct or circumstantial, of a conspiracy between Mr. Spilker and Mr. Miller to support the jury's verdict. There is no doubt that Mr. Spilker, Mr. Bulli, and Mr. Miller attended meetings where the incident was discussed, and the school district's response to it was determined. However, there is no evidence from which to reasonably infer that a conspiracy to deprive the Larsons of their right to report the incident was formed at these meetings. Mr. Spilker, at Superintendent Miller's explicit instructions, informed the Larsons of all of the school's actions on the matter. The only information that Mr. Miller directed Mr. Spilker not to pass on to the Larsons was the information about Szynskie's prior arrest -- information that Mr. Miller reasonably believed was

-14-

obtained in confidence from the Chief of Police.[5]  In all other respects, Mr. Miller directed Mr. Spilker to inform the Larsons of everything that the school authorities had done and were doing, and Mr. Spilker did so.

We see no evidence from which a jury could conclude that a conspiracy existed among the school officials to deprive the Larsons of any constitutional rights, and we see no evidence of any acts from which a jury could conclude that any injury to or deprivation of the Larsons' constitutional rights actually occurred.  The jury's verdict in this case appears to have been the product of pure speculation and understandable sympathy for a little girl who was indisputably harmed.  Our decision is not intended to belittle the harm she has suffered, but rather to prevent the injustice of burdening persons who committed no unconstitutional misconduct with liability for that harm.  Absent some evidence of a conspiracy and absent some evidence that the actions of these defendants either caused injury to the plaintiffs or intentionally prevented the plaintiffs from exercising a right or privilege granted them as United States citizens, there can be no liability under § 1985.

Because the evidence was insufficient to allow a reasonable jury to find the existence of a civil rights conspiracy among the school officials, we conclude that the jury awards of compensatory and punitive damages were properly set aside.  Given this conclusion, we need not reach the Larsons' contention that the school officials harbored an invidiously discriminatory animus toward handicapped females.  We likewise need not reach the propriety of the district court's alternate holding that the intracorporate conspiracy doctrine also bars the punitive damage

---

[5]The Larsons actually learned about Szynskie's prior arrest at about the same time that the school officials learned of it from the Chief of Police.

award.[6]

## C.  The Larsons' Pendent State Law Negligence Claims.

The Larsons also alleged that the defendants were negligent under state law for failing to properly screen, supervise, and reprimand Szynskie, the van driver, and for failing to follow the school district's guidelines.  The district court dismissed the Larsons' pendent negligence claim, concluding that it was barred by the discretionary function exception to the Nebraska Political Subdivisions Tort Claim Act.  We review the district court's determination of state law de novo.  Salve Regina College v. Russell, 499 U.S. 225, 231, 238 (1991).

The Nebraska Political Subdivision Tort Claims Act, Neb. Rev. Stat. § 13-905 to § 13-926 (Reissue 1991) (the Act), provides a limited waiver of governmental immunity that allows a plaintiff to recover for injuries caused by the negligence of a subdivision's officers, agents, and employees.  Under the discretionary function exception, however, a plaintiff may not recover for a claim "based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused."  Neb. Rev. Stat. § 13-910(2) (Reissue 1993).  In other words, the "[p]erformance or nonperformance of a discretionary function cannot be the basis for liability under the Political Subdivisions Tort Claims Act."  Lemke v. Metropolitan Util. Dist., 502 N.W.2d 80, 87 (Neb. 1993).

---

[6]According to the intracorporate conspiracy doctrine, a corporation cannot conspire with itself through its agents when the acts of the agents are within the scope of their employment. Runs After v. United States, 766 F.2d 347, 354 (8th Cir. 1985). The intracorporate conspiracy doctrine is equally applicable to governmental entities such as school districts.  Id.

Under Nebraska law, "[t]he discretionary-function exemption extends only to the basic policy decisions and not to ministerial acts arising therefrom." Koepf v. County of York, 251 N.W.2d 866, 870 (Neb. 1977).  An element of judgment or choice is "essential and indispensable" for discretionary conduct to be exempted from liability.  Lemke, 502 N.W.2d at 87.  The Act thus protects "`the discretion of a governmental executive or administrator to act according to one's judgment of the best course to be taken.'" Security Inv. Co. v. State, 437 N.W.2d 439, 444 (Neb. 1989) (quoting Wickersham v. State, 354 N.W.2d 134, 138 (Neb. 1984)). The type of discretion protected "`includes determinations or judgments made in establishing plans.  Where policy judgment exists, there also exists discretion exempted from liability under the State Tort Claims Act.'"  Id. (quoting Wickersham, 354 N.W.2d at 138).  A ministerial act, on the other hand, is "one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done."  Jasa By and Through Jasa v. Douglas County, 510 N.W.2d 281, 290 (Neb. 1994) (internal quotations and citation omitted).

We conclude that the district court properly relied on the discretionary function exception to the Political Subdivision Tort Claims Act in this case.  We agree with the district court's assessment that decisions to "investigate, hire, fire, and retain" employees are generally discretionary.  Thus, these decisions fall within the discretionary function exception and cannot be the basis for liability on the part of the school district.

The Larsons also contend that the school district failed to follow PLSD's established policy with regard to child abuse

-17-

reporting. PLSD's policy[7] required compliance with the Nebraska state child abuse reporting law and required the superintendent to formulate a procedure to be followed in cases of suspected child abuse. We believe that the grant of responsibility to formulate procedures involves the type of policy-making judgment that is exempted from the Act. Furthermore, the decision of whether to report the 1988 inappropriate conversation by Szynskie pursuant to the state child abuse reporting statute turned upon an exercise of personal discretionary judgment. The Nebraska child abuse reporting law requires any person to report suspected child abuse if that person has "reasonable cause to believe a child has been subjected to abuse." Neb. Rev. Stat. § 28-711 (Reissue 1989). Whether or not "reasonable cause" exists within the meaning of the statute requires an exercise of discretion and personal judgment, which takes the matter out of the realm of a ministerial act. In other words, the conditions of the statute describing when child abuse reporting is required are not so specifically designated and devoid of personal judgment as to render this a ministerial act.

## III. CONCLUSION

After carefully reading the testimony offered at trial, we conclude that the experienced district judge's granting of the defendants' posttrial motion for judgment as a matter of law was correct. There is woefully insufficient evidence from which a reasonable jury could find a § 1983 violation or a civil rights conspiracy to deprive Angela or her parents of any constitutional

---

[7]REPORTING OF SUSPECTED ABUSE/NEGLECT OF STUDENTS (5015)

The District recognizes its responsibility in helping prevent abuse. The District and its employees will follow applicable state laws in the reporting of suspected cases of abuse or neglect.

The superintendent is responsible for formulating a procedure to be followed by District employees to be followed in suspected cases of child abuse or neglect.

rights.  We also conclude that the district court properly dismissed the pendent state negligence claim.  Accordingly, we affirm the judgment of the district court.

FLOYD R. GIBSON, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, concurring in part and dissenting in part.


I agree with the majority's analysis of the Larsons' 42 U.S.C. § 1983 claim. I write separately, however, to express my disagreement with its treatment of the Larsons' 42 U.S.C. § 1985(3) conspiracy claim and pendent tort claim.


I believe the Larsons produced sufficient evidence to allow a reasonable jury to find that Roger Miller and George Spilker, in an effort to save face and avoid potential liability, conspired to intimidate Angela Larson and her family into not reporting her abuse to the proper authorities. City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651 (8th Cir. 1989) (We review the district court's entry of judgment as a matter of law in the light most favorable to the party who prevailed before the jury). This Court has defined a civil conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir. 1973) (quotations omitted). In order to prove the existence of a conspiracy under § 1985(3), the Larsons "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." City of Omaha Employees Betterment Ass'n, 883 F.2d at 652 (citation omitted). That may be accomplished by "pointing to at least some facts which would suggest that [the defendants] reached an understanding to violate [the Larsons] rights." Id. (quotations omitted). The Larsons need not show that each participant knew the "exact limits of the illegal plan . . . ." Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979) (quotation omitted), rev'd in part on other grounds, 446 U.S. 754, 759 (1980). The question of the existence of a conspiracy to deprive the plaintiffs of their

-20-

constitutional rights "should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." Putnam v. Gerloff, 701 F.2d 63, 65 (8th Cir. 1983) (quoting Hampton, 600 F.2d at 621).

The evidence is clear that, beginning on Monday, January 30th, Spilker and Miller were in constant communication regarding Angela's allegations. Miller repeatedly directed Spilker to pass certain information on to the Larsons while withholding other information. Following each meeting, Spilker reiterated what could reasonably be interpreted as thinly-veiled threats regarding slander liability as well as the effect that going public with the charges would have on Angela's school-age brother. He also disparaged Angela's credibility, repeatedly emphasizing that the issue would ultimately come down to Angela's word against that of the van driver. Spilker also told Gail Larson that he had learned in the course of a meeting with Bulli and Miller that Angela was the one instigating the sexual comments. Giving the Larsons the benefit of all reasonable inferences, Pumps & Power Co. v. Southern States Indus., 787 F.2d 1252, 1258 (8th Cir. 1986), I believe they produced sufficient evidence to allow the jury to reasonably infer that Miller and Spilker had reached an understanding to violate the Larsons' civil rights.

The evidence adduced at trial also indicates that this administrative browbeating successfully prevented the Larsons from reporting Angela's abuse to the proper legal authorities over the weekend beginning on Friday, January 27, until Tuesday, January 31. In doing so, Miller and Spilker successfully conspired to deprive the Larsons of both their First Amendment right to report Angela's abuse and their right to equal protection under the law, albeit temporarily. The record indicates that the Larsons decided to report the incident only after a family meeting in which they collectively decided to brave Spilker's threats. Miller and

-21-

Spilker's conspiracy was, admittedly, only temporarily successful in muzzling the Larsons. I do not, however, believe that a temporary violation of constitutional rights is the equivalent of no violation whatsoever. For these reasons, I would reverse the district court's grant of judgment as a matter of law on the Larsons' conspiracy claim.

I would also remand the pendent negligence claim to the extent that it alleges a failure to follow and comply with PLSD's established policy on the prevention and reporting of suspected cases of child abuse or a failure to comply with the Nebraska child abuse reporting statute. Neb. Rev. Stat. § 28-711 (Reissue 1989).

The Larsons' negligence claim necessarily raises the issue of whether Miller negligently failed to follow PLSD's established policy in effect since 1987 on the reporting of suspected child abuse.[1] That policy directs the superintendent to formulate a procedure to be followed by PLSD officials in the reporting of suspected child abuse or neglect. At trial, Miller flatly admitted that he had failed to develop any such procedures whatsoever.

The majority immunizes Miller's nonfeasance by concluding that the responsibility of formulating the type of procedures mandated by PLSD's policy requires the type of decision-making and policy judgment safeguarded by the discretionary function exception to the Nebraska Tort Claims Act. I disagree. This case is not about second-guessing the merits of any procedures developed by Miller,

---

[1]REPORTING OF SUSPECTED ABUSE/NEGLECT OF STUDENTS (5015)

The District recognizes its responsibility in helping prevent abuse. The District and its employees will follow applicable state laws in the reporting of suspected cases of abuse or neglect.

The superintendent is responsible for formulating a procedure to be followed by District employees to be followed in suspected cases of child abuse or neglect.

-22-

but rather his admitted and uncontroverted failure to formulate any procedures whatsoever in direct contravention of that policy's mandate. As the Nebraska Supreme Court observed, "the discretionary function exception will not apply when a . . . statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Jasa ex rel. Jasa v. Douglas County, 510 N.W.2d 281, 289 (Neb. 1994). Consequently, I believe Miller's failure to follow PLSD's established directive implicates the violation of a ministerial duty, not the type of incorrect policy decision protected by the discretionary function exception, and is therefore actionable under the Nebraska Tort Claims Act.

The Larsons' tort claim also raises the issue of whether the defendants' failure to properly respond to Angela's complaint violated Nebraska's reporting statute. That law requires all persons "having reasonable cause to believe that a child has been subjected to conditions or circumstances which reasonably would result in abuse or neglect" to "report such incident or cause a report to be made to the proper law enforcement agency . . . . " Neb. Rev. Stat. § 28-711 (Reissue 1989). While the determination of "reasonable cause" certainly qualifies as a discretionary function, the duty to report the suspected abuse to the proper authorities once such reasonable cause has been established is a purely ministerial act, utterly devoid of any discretion or policy judgment. I believe that PLSD officials clearly had reasonable cause as a matter of law to report Angela's abuse as early as Friday, January 27, 1989, and certainly once the background check revealed Szynskie's sordid past. As such, I believe that PLSD's failure to follow the clear mandate of the Nebraska reporting statute despite the existence of "reasonable cause" represents the dereliction of a ministerial duty. At the very least, I would remand this issue to the district court for further consideration of whether or not such reasonable cause existed from January 27, 1989, to January 31st of that year.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.