**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. 14) is **GRANTED;**

**IT IS FURTHER ORDERED** that Plaintiff's Complaint (Doc. 4) is **DISMISSED.**

Leroy H. **CARHART**, M.D., Plaintiff,

v.

L. Dennis **SMITH**, et al., Defendants.

No. 4:01CV3007.

United States District Court,
D. Nebraska.

April 18, 2001.

Alan G. Stoler, Jerry M. Hug, Omaha, NE, Simon Heller, Sherrie Russell–Brown, Maya Manian of The Center for Reproductive Law and Policy, New York City, for Plaintiff.

David R. Buntain, John C. Wiltse, Richard R. Wood from the University of Nebraska, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION

URBOM, Senior District Judge.

This matter is before me on the plaintiff's motion for a preliminary injunction, filing 2. The plaintiff, Dr. LeRoy Carhart,

seeks to be restored in his volunteer faculty position in the Department of Pathology and Microbiology at the University of Nebraska Medical Center. A hearing on the plaintiff's motion was held on March 12 and 13, 2000. I have considered the evidence and testimony presented at the hearing and the briefs submitted by the parties. I find that the plaintiff's motion must be denied.

## I. FACTUAL BACKGROUND

The plaintiff is a physician licensed to practice medicine in the State of Nebraska and elsewhere who performs abortion procedures. (Hr'g Tr. at 11:3–4.) The plaintiff provided fetal tissue he retrieved from his abortion patients to researchers at the University of Nebraska Medical Center (UNMC) Department of Pathology and Microbiology. (Hr'g Tr. at 17:5–12.)

On June 3, 1997, the Nebraska Unicameral passed Legislative Bill 23, which prohibited most "partial birth" abortion procedures within the state. Legislative Bill 23 was subsequently signed by the governor and codified at Neb. Rev. Stat. §§ 28–326(9) and 28–328 (1997). On June 12, 1997, the plaintiff filed a complaint in this court challenging the constitutionality of Nebraska's partial birth abortion law. *Carhart v. Stenberg*, 4:97CV3205, filing 1.

Shortly after filing his complaint, the plaintiff was appointed Volunteer Adjunct Assistant Professor (Clinician) in the Department of Pathology and Microbiology at UNMC, effective October 1, 1997. (Pl.'s Ex. 3.) The plaintiff testified that beginning in 1981, he was an unpaid member of the faculty at UNMC in the Department of Surgery. (Hr'g Tr. at 13:3–21.) His responsibilities in that department consisted primarily of teaching medical students and some residents in conjunction with a Dr. Campbell. (Hr'g Tr. at 13:22–14:6.) The plaintiff assumed that his unpaid appointment in the surgery department was never terminated, but that his appointment was simply transferred to the pathology and microbiology department in 1997 because by that time he was collaborating with researchers in the latter department. (Hr'g Tr. at 14:7–17, 16:16–17:4.)

The plaintiff's duties as a volunteer faculty member in the Department of Pathology and Microbiology consisted of attending research meetings, lectures, and social functions. (Hr'g Tr. at 17:13–19.) He also continued collecting, refining, and submitting fetal brain tissue for UNMC's research program, working most directly with a Dr. Gendelman. (Hr'g Tr. at 17:19–18:1.) Dr. Gendelman told the plaintiff that the specimens that he provided were better than those obtained from others in the past, and that the department of pathology appreciated his contributions. (Hr'g Tr. at 18:9–16.)

Eventually, the plaintiff prevailed in his constitutional challenge: the district court enjoined enforcement of the Nebraska partial birth abortion statute in an order dated July 2, 1998. *Carhart v. Stenberg*, 11 F.Supp.2d 1099 (D.Neb.1998). On September 24, 1999, the Eighth Circuit affirmed the judgment of the district court. *Carhart v. Stenberg*, 192 F.3d 1142 (8th Cir.1999).

The United States Supreme Court granted Stenberg's petition for writ of certiorari on January 14, 2000. *Stenberg v. Carhart*, 528 U.S. 1110, 120 S.Ct. 865, 145 L.Ed.2d 725 (2000). After the publication of the Eighth Circuit's decision and as his case was pending before the Supreme Court, Dr. Carhart began to draw attention from the news media in Nebraska. In November 1999, the existence of UNMC's fetal cell research project was publicized, and the plaintiff's connection with UNMC became more widely known. (Hr'g Tr. at 19:19–20:9; 53:14–54:2.) Following a con-

versation with Dr. Gendelman and on the same day that the media reported the plaintiff's connection with UNMC's fetal tissue research, the plaintiff removed the notation revealing his UNMC faculty appointment from the personal biographical information available on his website. (Hr'g Tr. at 20:10–4, 23:25–24:5.) Within a few months, possibly in December 1999, the plaintiff and his wife met with Bob Bartee, Dr. Gendelman, and perhaps Dr. Cohen and another unidentified person. (Hr'g Tr. at 25:6–22, 180:23–181:23.) Mr. Bartee is an executive assistant to the chancellor at UNMC, and Dr. Cohen is chair of the Department of Pathology and Microbiology at UNMC. The plaintiff testified that at this meeting, he was encouraged to resign in order to protect the fetal tissue research from the "anti-choice community." (Hr'g Tr. at 26:6–18.) The plaintiff refused to resign his position. (Hr'g Tr. at 25:12–13.)

Drew Miller, a University of Nebraska regent who was beginning his re-election campaign, was aware of the growing public concern regarding UNMC's controversial fetal tissue research program. Apparently, Miller believed that severing UNMC's ties with Carhart would appease certain opponents of the research. In an email to Bob Bartee and others dated March 28, 2000, Regent Miller stated that Carhart's resignation would help ensure that the fetal tissue research at UNMC would continue. (Pl.'s Ex. 17.) This concern resurfaced in numerous emails exchanged between Miller and Bartee and other persons during March and April of 2000. (Pl.'s Ex. 41, 18, 20, 22, 24, 40, 25, 28.) In one email, Regent Miller suggested that Bartee would "deserve a major

University award" if he could complete his draft of a press release announcing Carhart's resignation within the week of Wednesday, April 19, 2000. (Pl.'s Ex. 28. *See also* Pl.'s Ex. 26–27.) In addition to his concern for the preservation of the fetal tissue research program, it is clear that Regent Miller was motivated to push for Carhart's resignation in order to further his campaign for re-election. (Pl.'s.Ex. 19, 20, 21, 22, 23.) In an email to Bob Bartee dated April 14, 2000, Regent Miller wrote, "Metro Right to Life has been mailing already; and is scoring points with message: 'Carhart is on UNMC faculty.' This bothers people a lot. If you can sever the Carhart faculty link you'll help the Med Center and its allies out a huge amount." (Pl.'s Ex. 21.) In an email dated April 26, 2000 to "Bevmaurer,"[1] Miller wrote, "I'm still convinced I'll lose the primary due mainly to name recognition advantages. I have some great plans that you will adore that I think will yield victory in November. Much depends on whether or not we can convince Carhart to relinquish his voluntary faculty status." (Pl.s' Ex. 23.)[2]

Regent Miller was also apparently concerned that Dr. Carhart's lawsuit and the publicity associated with it would directly affect his interests in preserving the fetal tissue research at UNMC and in securing his own re-election. There is evidence that Miller's plans to obtain the plaintiff's voluntary resignation were linked to the progression of the plaintiff's case. "If we can break from Carhart the burden would be hugely relieved. Yes, its still abortion, but we'd have someone who is not fighting Attorney General, not as universally hated . . . ." (Pl.'s Ex. 41.) "I'd like to do this

**1.** Although I believe the identity of the recipient of this email has not yet been definitively established at this time, I am aware the Chancellor Maurer's wife is named Beverly. (Hr'g Tr. at 170:19–171:3.)

**2.** Regent Miller was re-elected in the November 2000 general election. (Pl.'s Ex. 50, Dep. Miller at 24:7–12.)

[talk Carhart into voluntarily relinquishing his faculty title] before the Supreme COurt [sic] hearing! The Carhart controversy could actually get worse; and he'd be better off voluntarily giving it up now." (Pl.'s Ex. 23.)

> I know you are out of town and wanted to wait; but with the Supreme Court case coming up; I think we should try to meet with Carhart NOW to ask him score himself some publicity points by relinquishing the voluntary faculty status in the interests of helping the research at UNMC. It would give him a potential boost here at home. From our perspective, you can bet that the pro-life people will see a media opportunity to condemn Carhart and his honorary faculty status at UNMC during this round of publicity. If Carhart cites his UNMC work before the Supreme Court while the State Attorney General is arguing a case against him, this could be the worst moment ever for UNMC. Has anyone thought about this? ? ? ?

> I don't think we can wait— I want to meet with Carhart, show him a suggested press release that puts a spin on this that will help him a great deal and forestall this potentially worst ever publicity disaster ever for UNMC....

> I think it is a huge mistake to keep waiting, we should do this NOW.

(Pl.'s Ex. 24, 40.) (*See also* Pl.'s Ex. 19, 27, 28.)

The Supreme Court affirmed the decision enjoining the enforcement of the Nebraska partial birth abortion statute on June 28, 2000. *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743, (2000). Soon thereafter, Regent Miller's

call for UNMC to sever its relationship with Dr. Carhart was augmented by pressure from two different external sources. First, on approximately July 19, 2000, the Nebraska Republican Party resolved to "implore the University of Nebraska Board of Regents to immediately remove LeRoy Carhart from the University of Nebraska Medical Center faculty and to immediately stop using aborted baby body parts from induced abortions in research." (Pl.'s Ex. 42.) On August 8, 2000, Bob Bartee again met with the plaintiff and his wife. (Pl.'s Ex. 51; Hr'g Tr. at 27:13–19.) Bartee described the pressures facing UNMC from anti-abortion demonstrators, legislators opposed to the UNMC fetal tissue research, and regents seeking reelection, and suggested that might be helpful if the plaintiff would consider resigning his volunteer faculty position. (Hr'g Tr. at 35:9–25.) The plaintiff indicated that he would not agree to resign, telling Bartee that his resignation would support "terrorism," referring to the tactics of anti-abortion demonstrators. (Hr'g Tr. at 36:1–12.)

The resolution from the Nebraska Republican Party also contained an instruction that it be forwarded to each member of the University of Nebraska Board of Regents. (Pl.'s Ex. 42.) On or about the Labor Day weekend in 2000, Regent Miller met with the plaintiff and encouraged him to resign. (Hr'g Tr. at 37:8–38:18.) At this meeting, Miller presented the plaintiff with a "hypothetical news release" characterizing Carhart as a "man of conscience" for resigning his position in order to prevent political harm to the fetal cell research program at UNMC. (Pl.'s Ex. 44, Hr'g Tr. at 38:18–39:3.) [3] The plaintiff did

---

**3.** As I have alluded to previously, there is evidence that the idea to develop a hypothetical news release to assist in attempts to secure the plaintiff's voluntary resignation predated the resolution by the Nebraska Re-

publican Party. An email message from Miller to Bartee dated April 5, 2000, states, "And what about proposal to meet with Carhart WITH a draft press release on resigning his faculty appointment/attacking

not agree to voluntarily resign his position after meeting with Regent Miller. (Hr'g Tr. at 39:4–5.)

The second source of external pressure on UNMC to sever its connection with the plaintiff was a petition organized by Metro Right to Life. (Pl.'s Ex. 45.) Metro Right to Life is an organization whose mission, in the words of its president, is to respect human life from conception to natural death. (Hr'g Tr. at 71:9–11.) Mr. Robert Blank, the president of Metro Right to Life, testified that thousands of signatures were obtained on this petition. (Hr'g Tr. at 79:12–21.) A portion of the caption on the petition states:

> LeRoy Carhart is an abomination to Nebraska and we are incensed that you would allow our University to provide him credibility while he continues to suck the brains out of live, unborn babies for use in research at the UNMC. We pledge never to vote for any elected official who votes to use even one aborted baby for research.

(Pl.'s Ex. 45.) Regent Miller became aware of the petition on or before September 3, 2000. (Pl.'s Ex. 32.) In an email sent to Bob Bartee, Kim Robak, Ron Withem, Regent Chuck Hassebrook, UNMC Chancellor Hal Maurer, and Nancy O'Brien on September 3, Regent Miller stated:

> At the State Fair, Metro RTL is distributing a "Petition to University of Nebraska Board of Regents to Fire Partial Birth Abortionist LeRoy Carhart"
>
> I've been pushing UNMC to get him to relinquish this for MONTHS, and I warned that such a move like this was likely and will not be defensible. Its [sic] a perfectly predictable political move; puts UNMC and BOR in worst possible position on this matter....
>
> As you may or may not know, I spoke with Carhart a few weeks ago and urged him to voluntarily relinquish his honorary faculty status before he's put in a position where its [sic] taken away.... This petition is not in press yet that I know of; though the Lincoln Journal and OWH are both working on stories about the Metro exhibit. If they go to it they will see this petition. Once the article is out, Carhart's opportunity to relinquish this without looking like he was pressured to give it up is gone, and much of the positive benefit is lost.
>
> We have a few days at most to convince Carhart to ISSUE THE PRESS RELEASE we gave him and score some positive points on this; or get UNMC and BOR drug through dirt on this AND LOSE. Moderate people do not like the honorary faculty position, Sen Kerry has told me its [sic] a collossal [sic] DUMB THING—- yet after 10 months of us telling UNMC to get this honorary position withdrawn its [sic] still there.
>
> Dr. Gendelman needs to press Carhart to act NOW. Bob Bartee needs to get on this NOW and make it happen.

(Pl.'s Ex. 32.) Regent Miller faxed a copy of the petition to the plaintiff on or about September 5, 2000. (Decl. of Carhart in Supp. of Mot. for Prelim. Inj. ¶ 8.)

Sometime prior to September 12, 2000, Robert Blank was contacted by Regent Rosemary Skrupa and told that "something big was going to happen," and Blank believed that this "something" related to Dr. Carhart. (Hr'g Tr. at 87:10–90–11.) In a letter dated September 12, 2000, the plaintiff was informed that his faculty ap-

Bob Blank and Larry Donlan." (Pl.'s Ex. 18.) (See also Pl.'s Ex. 20, 24, 25, 26, 27, 28 and Hr'g Tr. at 245:15–246:19.)

pointment would terminate on December 20, 2000. (Pl.'s Ex. 3.) Shortly after the letter dated September 12 was sent, Regent Skrupa again called Mr. Blank and indicated that the "big thing" she had referred to had happened. (Hr'g Tr. at 90:12–91:23.) In one of these two conversations, Skrupa told Blank that she had been asking or telling the other regents to get rid of Carhart. (Hr'g Tr. at 90:24–91:3.) Regent Miller also took credit for the action taken to terminate the plaintiff, at least in some circles. In an email dated October 4, 2000, Regent Miller wrote, "Did you see where UNMC is moving to get Carhart off volunteer faculty— more pro-life Drew Miller in action— but Blank/Schmit–Albin would never believe me and I'm still a "pro-abortion Nazi" in their eyes." (Pl.'s Ex. 33.) (See also Pl.'s Ex. 34 at 1.)

As the events described above began unfolding, UNMC appointed a new Dean. As of the hearing on the plaintiff's motion for a preliminary injunction, Dr. James Armitage had been employed at UNMC for nearly 19 years, serving as chair of the Department of Medicine from 1990 until January 1, 2000. (Hr'g Tr. at 110:20–111:3.) In the latter half of 1999, he interviewed for the position of Dean at UNMC. (Hr'g Tr. at 111:22–112:1.) During his interview, Armitage mentioned that, were he appointed Dean, he would "institutionalize better treatment of the volunteer faculty." (Hr'g Tr. at 113:16–18.) Armitage did in fact become Dean at UNMC on April 1, 2000. (Hr'g Tr. at 113:24–25.)

On April 7, 2000, Dean Armitage created an ad hoc committee chaired by Dr. Michael Sitorius to review the volunteer faculty at UNMC. (Pl.'s Ex. 1.) Ultimately this faculty review became the means through which the plaintiff's faculty position was terminated. The committee held an initial meeting on April 13, 2000. (Pl.'s Ex. 2.) The meeting was opened by Dean Armitage and closed with a suggestion that the committee members collect information about past volunteer faculty reviews at UNMC and other institutions. (Def.'s Ex. 49, Canedy Dep. at 17:15–18:7.) The committee apparently engaged in no activity until Dr. Sitorius contacted the members by letter in late August, 2000. (Id. at 28:9–13, Hr'g Tr. at 328:19–329:7.) The committee met to review their final report sometime after August 29, 2000. (Def.'s Ex. 49, Canedy Dep. at 29:8–19.) On September 11, 2000, the day before the date of the letter notifying Carhart of his impending termination, the ad hoc committee reviewing the volunteer faculty completed its report. (Pl.'s Ex. 4.)

At the hearing on the plaintiff's motion for a preliminary injunction, Dean Armitage was questioned about the close temporal proximity of the completion of the committee's report and the mailing of the volunteer faculty "termination" letters. Dean Armitage's testimony on this point was inconsistent, contradictory, and in conflict with other evidence in the record. He first testified that after reviewing the report dated September 11, he directed Dr. Irene Klintberg to draft letters to be distributed to certain of the volunteer faculty, including the letter sent to Dr. Carhart. (Hr'g Tr. at 119:6–14.) Shortly thereafter he reversed himself, testifying that he directed Dr. Klintberg to draft the letters after receiving a verbal report from Dr. Sitorius prior to the completion of the committee's report on September 11. (Hr'g Tr. at 121:6–124:16.) Dr. Sitorius testified that he did not recall ever giving Dr. Armitage any oral report prior to the completion of the committee's written report. (Hr'g Tr. at 329:8–11.) Also, in an excerpt from Dean Armitage's deposition testimony read into the record at the hearing on the matter presently before me, Dr. Armitage stated that he did not take any

formal actions until he received a written report from the ad hoc committee. (Hr'g Tr. at 123:10–22.) Yet in a memo dated September 1, 2000, a Judy Houfek provided Bob Bartee with copies of the most recent drafts of the volunteer faculty letters, including the letter that was eventually sent to the plaintiff, at the direction of Dean Armitage. (Pl.s' Ex. 11.) Although this September 1 memo predates the ad hoc committee report by ten days, it reflects that these letters were already the product of "numerous" revisions. (*Id.*)

I find that well prior to the volunteer faculty committee's final report and without input from the committee, two distinct letters were designed for particular members of the volunteer faculty. Letter "A" was sent to volunteer faculty whose training and specialty were in the area of his or her departmental appointment, but had minimal or no active involvement in that department for a substantial period of time. (Pl.'s Ex. 5.) The "A" letter invited the recipient to reply and indicate whether he or she would like to be considered for a continued appointment, and requested that those persons who desired to retain their appointments outline the contributions they proposed to make to their department. (*Id.*) Letter "A" contained the following language:

> Please indicate below your status at this time.
>
> . . . . .
>
> 4. I have been inactive for a period, but wish to resume my participation in the academic programs of the Department. I have outlined on the enclosed document the contributions which I believe I can make and would like to be considered for a continued appointment.

> In the event that you choose not to continue participation in the Department, your faculty appointment will be terminated following receipt of your response to the above.

(*Id.*) It appears that two hundred and twenty-nine persons received the "A" letter. (Pl.'s Ex. 6.)

Letter "B" was to be sent to volunteer faculty whose appointment was not in the department that matched their "specialty/sub-specialty discipline." (Pl.'s Ex. 5.) Presumably, the plaintiff's appointment in the Department of Pathology and Microbiology was not in the area of his specialty or sub-specialty because he has no board certifications in that area.[4] This placed him on the list of volunteer faculty designated to receive a "B" letter.

Initially, it appears that thirty members of the volunteer faculty were designated to receive letter "B." (Pl.'s Ex. 7.) The "B" letter received by the plaintiff contained the following language:

> In the course of this review, it was noted that your volunteer faculty appointment is not in the Department of your specialty/sub-specialty as are those of other volunteer faculty. As a result, your faculty appointment in the Department of Pathology and Microbiology will terminate December 20, 2000.
>
> If you wish to be considered for a new volunteer faculty appointment in the department of your specialty/sub-specialty, we respectfully request that you make an application by October 1, 2000, to the chairman of that department noting the contributions which you are prepared to make to the academic programs of that department.

---

4. According to the plaintiff's testimony, he never sat for "the boards" while working for the United States Air Force, and after retiring from the Air Force as a lieutenant colonel in 1985, it was unnecessary for him to become board certified.

(Pl.'s Ex. 3.) It is undisputed that the plaintiff did not apply to any UNMC department prior to the October 1 deadline set forth in this letter.

Judith Houfek, an administrative assistant in the office of the Dean of UNMC, states that she has reviewed the personnel records of the thirty recipients of the "B" letter, and that none of these persons have been reappointed in other departments. (Defs.' Ex. 56.) However, evidence presented at the hearing established that at least nineteen of the volunteer faculty designated to receive "B" letters actually received a different "B" letter than the one received by the plaintiff. The members of the Department of Family Medicine, which is chaired by Dr. Sitorius, received a "B" letter that included the following language:

> You have been an active and valuable contributor to the educational efforts of the College through your educational commitments to the Department of Family Medicine; however, changes are on the horizon.

> ... In the course of this review, it has become evident that though you are making very valuable contributions, your appointment is not in the department of your specialty/sub-specialty as are those of other volunteer faculty. As a result, your *primary* appointment in the Department of Family Medicine will terminate December 20, 2000. Because you have been such a valuable contributor to the educational efforts of the College of Medicine and specifically the Department of Family Medicine, I will work with your specialty/sub-specialty to obtain a primary appointment in that de-

partment for you with a secondary appointment in the Department of Family Medicine. This will be a smooth transition and, other than possibly providing an updated curriculum vitae, will require no other work on your part.

> ... I look forward to your continued role on our faculty and in our Department of Family Medicine.

(Pl.'s Ex. 5.) [5] Unlike the letter sent to the plaintiff, this "family medicine B letter" contained language indicating that the letter's recipient would not be terminated, but that the department of his or her primary appointment would merely be changed as part of a "smooth transition." In light of this evidence, it is difficult to know what to make of Ms. Houfek's affidavit stating that none of the thirty "B" letter recipients were reappointed in other departments. On the contrary, it seems that members of the volunteer faculty in the Department of Family Medicine were never even truly terminated.

At any rate, a maximum of eleven members of the volunteer faculty, including the plaintiff, received "B" letters containing language indicating that they were terminated, but inviting them to reapply for a faculty position in the department of their specialty or sub-specialty. Dean Armitage believes that the other ten volunteer faculty received the same "B" letter as the plaintiff. (Hr'g Tr. at 139:12–18, 141:10–19.) However, he admits that he cannot recall seeing any of the other ten "B" letters, and no copies of the letters actually sent to these ten volunteer faculty members have been produced by the defen-

---

5. Dr. Sitorius testified that he was contacted about sending letters to the volunteer faculty in his department only after his committee's final report was submitted. (Hr'g ·Tr. at 325:19–24.) As I noted above, there is no credible evidence that the original "A" and "B" letters were drafted pursuant to the ad

hoc committee's report. As will be discussed more fully below, even Dr. Sitorius's version of the "B" letter cannot be said to be consistent with the committee's final report, because remarkably the report does not specifically address criteria for reviewing current volunteer faculty members.

dants. (Hr'g Tr. at 146:2–22.) Dean Armitage claims that it is not possible that the other ten volunteer faculty members received letters different from the one sent to Dr. Carhart, because Dean Armitage recalls that Dr. Sitorius specifically asked permission to sent his special version of the "B" letter to the nineteen volunteer faculty members in the family medicine department. (Hr'g Tr. at 140:1–10, 145:12–17.) Dr. Sitorius confirmed that he did ask Dean Armitage's permission to send out a different version of the "B" letter to the volunteer faculty in his department. (Hr'g Tr. at 326:20–23.) Dean Armitage testified that the chairs of the other departments with faculty slated to receive "B" letters did not ask if they could modify the letter, although Armitage states that he would have freely granted any such requests. (Hr'g Tr. at 145:12–17, 140:17–141:9.)

Dean Armitage's statements seem to contradict a portion of his deposition testimony reviewed at the hearing on March 12. (Hr'g Tr. at 141:21–144:20.) In this portion of the deposition, Armitage was presented with an exhibit consisting of a copy of Dr. Sitorius's version of the "B" letter:

Answer: ... It's from Dr. Sitorius, and it looks like it would be written to volunteer faculty in his department. I suppose was something he wrote trying to be sure the people in his department made the application for another department.

Question: Is this the first you've seen of that?

Answer: Yes.

. . . . .

Question: Do you know whether the chair of the family medicine department sent a different letter to volunteer faculty members in his department than the letters you signed?

Answer: While I'm not certain, that Exhibit 10 you gave me a moment ago might be such a letter so he may have.

Question: And do you know if the Department of Radiology sent out a different letter than the one you signed for Dr. Carhart?

Answer: I don't know that they did, no.

Question: Do you know if the Department of Internal Medicine used a different letter than the one you drafted and signed?

Answer: I don't know that they did. I would be surprised but I don't know.

(Hr'g Tr. at 142:11–17, 143:22–144:11.) At the time of his deposition, Dean Armitage had not seen Dr. Sitorius's version of the "B" letter before, he did not know whether Dr. Sitorius's letter was actually sent out, and he could not say whether any of the volunteer faculty on the "B" list received the same letter as Dr. Carhart. (*Id.*) Yet at the hearing, Dean Armitage testified that it is not possible that Dr. Carhart was the only volunteer faculty member to receive the original version of the "B" letter and that Dr. Sitorius specifically asked his permission to send out the family medicine version of the "B" letter. Additionally, there is some evidence that Dean Armitage asked the department chairs to draft their own versions of the letters sent to the volunteer faculty. (Hr'g Tr. at 331:12–332:19.) I find that Dean Armitage's testimony is not credible, and that based upon the evidence now before me, *it is possible* that the plaintiff received a unique "termination" letter.

As I have already described, Bob Bartee was contacted several times by Regent Miller throughout the spring and in late summer, 2000, and was encouraged to sever UNMC's connection with Dr. Carhart. Bartee was also involved in the volunteer faculty review process initiated by Armi-

tage. (Hr'g Tr. at 187:3–13.) Mr. Bartee testified that his involvement in the volunteer faculty review process began after his meeting with the plaintiff on August 8, 2000. (Hr'g Tr. at 290:20–25.) Bartee reviewed drafts of the "A" and "B" letters and prepared a strategy for dealing with issues that would be raised by Carhart's termination. (Hr'g Tr. at 187:3–189:24.) Although Dean Armitage testified that he did not recall requesting or even seeing the strategy documents comprising Plaintiff's Exhibits 12 and 14, Bartee testified that he drafted these documents for Armitage specifically in anticipation of complications resulting from the possibility that Carhart would be terminated as a result of the volunteer faculty review process. (*Compare* Hr'g Tr. at 151:17–153:3, 156:13–19 *with* Hr'g Tr. at 187:23–189:7, 189:17–24, 201:12–202:21.)

One of the documents drafted by Mr. Bartee for Dean Armitage is entitled "Volunteer Faculty Review Process Strategy." (Pl.'s Ex. 12.) The document is dated August 31, 2000, which of course predates the report of the ad hoc committee regarding the volunteer faculty. (*Id.*) The document contains a heading "Possible Negative Reactions" with a subheading, "Abruptness and timing of decision (why now)." (*Id.*) Bartee testified that this item refers to the fact that if Carhart were affected by the volunteer faculty review process, the timing of the faculty review would make the review seem like "[y]ou just pulled this out of a hat or whatever." (Hr'g Tr. at 190:17–23.) He later stated, however, that such a statement is "boilerplate" that is normally included in communication strategies. (Hr'g Tr. at 280:5–10.) Bartee also felt that it would be important to inform the "congressional delegation from Nebraska" and Dr. Gendelman if the faculty review were to affect Dr. Carhart. (Hr'g Tr. at 192:9–25, 193:15–18.) Bartee testified that the congressional delegation

should be told that there would be no comment regarding Dr. Carhart and the faculty review due to "personnel reasons." (Hr'g Tr. at 192:18–24.)

Another heading on this document states, "Fallback Plans Should Tissue Source End," which Bartee testified was in anticipation of Carhart ceasing to supply tissue following his termination. (Hr'g Tr. at 195:10–13.) Bartee was also concerned that a negative response to Carhart's termination from the "pro-choice folks" might jeopardize the tissue supply for the research program. (Hr'g Tr. at 193:19–194:4.)

Although a large number of volunteer faculty members were somehow affected by the volunteer faculty review, the only doctor whose termination was specifically identified as presenting public relations problems was the plaintiff. (Hr'g Tr. at 283:8–17.) Also, the plaintiff was probably the only person on the list of volunteer faculty designated to receive either an "A" or "B" letter who was participating in a basic science research project such as the fetal tissue research program. (Hr'g Tr. at 395:12–396:16.)

After the "A" and "B" letters were drafted, and after Bartee provided Armitage with his volunteer faculty review strategy documents, the ad hoc committee released its final report on September 11, 2000. (Pl.'s Ex. 4.) The final report states that its initial charge included an evaluation of the appointment, qualifications, services expected, reward and recognition, criteria for review and reappointment, and promotion of the volunteer faculty. (*Id.*) However, the final report contains no further mention of the criteria for review and reappointment of existing faculty. (*Id.*) Nevertheless, the "A" and "B" letters, some of which terminated existing volunteer faculty members, purported to be is-

sued as a result of the ongoing review of the volunteer faculty. (Pl.'s Ex. 5, 14.) Dean Armitage testified that he interpreted the committee's report regarding "initial appointments" to apply to then-current volunteer faculty, but when given the opportunity to review the report, he admitted that the report did not address anything about reviewing, reappointing, or terminating members of the volunteer faculty. (Hr'g Tr. at 124:17–128:23, 174:10–25.) Dr. Sitorius first testified that the criteria for review and reappointment are "weaved into the whole document," and then added that he and his committee felt that the heading "initial appointments" actually referred to everyone already on the faculty in addition to any new appointments. (Hr'g Tr. at 330:5–25.) He admitted that his committee's report did not specifically address termination of faculty members. (Hr'g Tr. at 336:19–20.) Dr. Sitorius also testified that he did not anticipate that within a day or so of his committee's report, which did not address termination of existing faculty, letters such as the "A" and "B" letters would be mailed. (Hr'g Tr. at 336:21–337:25.)

## II. PRELIMINARY INJUNCTION

■ In *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981), the court, sitting *en banc*, identified the following factors that should be considered by district courts when reviewing motions for preliminary injunctive relief:

(1) the threat of irreparable harm to the movant;

(2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

(3) the probability that movant will succeed on the merits; and

(4) the public interest.

*Id.* at 114. "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998).

### A. The Threat of Irreparable Harm to the Movant

■ The plaintiff argues that as a result of his termination from his volunteer faculty appointment, he has suffered two forms of irreparable injury. First, he claims that his reputation has been harmed by his dismissal, which in turn has caused him to suffer emotional harm. The plaintiff states that his former volunteer faculty appointment added to his reputation and professional credentials, and he claims that prestige, publication, and research opportunities accompany the position. (Carhart Dec. ¶ 11, filing 3.) At the hearing on the plaintiff's motion for a preliminary injunction, the plaintiff testified that he thought he was very upset when he received his termination letter, that his termination was widely publicized, and that his termination provided fuel for the protesters outside his clinic. (Hr'g Tr. at 40:24–25, 42:9–21, 43:12–44:3.) In support of his argument that these facts constitute irreparable injury, the plaintiff refers me to a single Ninth Circuit case, *Chalk v. United States District Court Central District of California*, 840 F.2d 701 (9th Cir.1988), wherein a teacher with Acquired Immune Deficiency Syndrome (AIDS) was reassigned from a classroom position to an administrative position. The Ninth Circuit found that the district court's determination that the plaintiff failed to demonstrate that he was threatened with the possibility of irreparable injury was clearly erroneous:

In making its finding, the court focused on the monetary loss to Chalk and con-

cluded that he was no worse off than before the reassignment. This approach failed to consider the nature of the alternative work offered Chalk. Chalk's original employment was teaching hearing-impaired children in a small-classroom setting, a job for which he developed special skills beyond those normally required to become a teacher. His closeness to his students and his participation in their lives is a source of tremendous personal satisfaction and joy to him and of benefit to them. The alternative work to which he is now assigned is preparing grant proposals. This job is "distasteful" to Chalk, involves no student contact, and does not utilize his skills, training, or experience. Such non-monetary deprivation is a substantial injury which the court was required to consider.

*Id.* at 709. It seems to me that *Chalk* is correct in its holding that it would be erroneous for me to fail to consider whether the plaintiff's "non-monetary deprivation" constitutes irreparable injury. However, it is a different question whether, upon such consideration, it is reasonable to conclude that the injuries the plaintiff complains of constitute irreparable harm for the purposes of a preliminary injunction. At this level of analysis, *Chalk* does not support the plaintiff's argument.

The Ninth Circuit recognized that in employment discrimination cases such as *Chalk*, there may be immediate emotional and psychological injuries which cannot be adequately compensated by a monetary award after trial. *Id.* at 710. "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Id.* (quoting *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987)). The court also recognized that

due to the current state of medical knowledge with respect to AIDS, Chalk may be left with precious little time during which he might work productively, and delaying relief pending trial would irretrievably deprive him of that time. *Id.* The present case presents none of these facts.

The defendants point out that an irreparable injury is one "that a court would be unable to remedy even if the movant would prevail in the final adjudication." 13 MOORE'S FEDERAL PRACTICE § 65.06[2] (Matthew Bender 3d ed.). The plaintiff has argued that he has suffered injuries that should be remedied by reinstatement. These include injuries to his reputation, professional credentials, prestige, opportunities for publications and research, and emotional well-being, along with undesired publicity and additional negative source material for his protestors. However, evidence is lacking that would establish that reinstatement after trial, as opposed to today, would not suffice to address these injuries. The plaintiff relies solely on *Chalk*, yet the obviously severe emotional and psychological injuries faced by a plaintiff who is discriminated against due to AIDS and the clear necessity for expedited relief due to the nature of that illness are simply not present in this case. I have considered the plaintiff's injuries, and I find that they do not constitute irreparable harm for the purposes of his motion for a preliminary injunction. His injuries may be adequately addressed following the trial.

█ The plaintiff's second argument asserts that when a deprivation of constitutional rights can be shown, no further showing of irreparable injury is required.

The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Since such injury was both

threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief.

*Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). *See also Saint v. Nebraska School Activities Association,* 684 F.Supp. 626, 628 (D.Neb. 1988); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 867 (8th Cir.1977).

The plaintiff argues that his termination from the faculty at UNMC constitutes ongoing retaliation for exercising his First Amendment rights, and that the plaintiff's termination chills his and the entire UNMC faculty's willingness to exercise their rights in the future. On the one hand, the defendants point out that generally speaking, preliminary injunctions are only issued in employment cases in "genuinely extraordinary situation[s]." *Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 300 (8th Cir.1996) (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). On the other hand, under *Elrod* and in the Eighth Circuit, a deprivation of constitutional rights generally constitutes irreparable injury.

I find that the plaintiff is correct that ongoing retaliation against the exercise of First Amendment rights can create a chilling of those rights that constitutes an irreparable injury, but in the Eighth Circuit one must do more than simply allege that such a chill is in the air:

Finally, Adam–Mellang argues that placing her on unpaid administrative leave and removing her from the Board of Directors was such clear retaliation for her assertion of sex and age discrimina-

tion claims that, unless enjoined, it will chill other Apartment Search employees, particularly Patricia Hovland, from asserting their statutory rights or appearing as witnesses in this case. A number of circuits have concluded that the chilling effect of unrestrained retaliation can be irreparable injury justifying a preliminary injunction. However, those courts have uniformly held that a chilling effect of this nature will not be presumed. It is an issue of fact that the employee seeking a preliminary injunction must prove.

*Adam–Mellang,* 96 F.3d at 301. Although *Adam–Mellang* refers to "statutory" as opposed to "constitutional" rights, I find that this fact does not meaningfully distinguish the present case from *Adam–Mellang.* Cf. *Bloom v. O'Brien,* 841 F.Supp. 277, 279 (D.Minn.1993) (finding that the plaintiffs' burden of demonstrating a chilling effect was met when exercising a First Amendment right would subject a plaintiff to criminal prosecution).

In this case, the plaintiff has not argued that he is currently experiencing a loss of First Amendment freedom, as was the case in *Saint v. Nebraska School Activities Association,* 684 F.Supp. 626, 628 (D.Neb. 1988) or *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 867 (8th Cir.1977). Nor has he argued that he has been threatened with such a loss. Instead, the plaintiff has argued that the loss of First Amendment freedom referred to in *Elrod* is in the form of a chilling effect upon himself and others. When making such a claim, *Adam–Mellang* requires that the plaintiff present evidence that such a chilling effect is occurring. However, there is no evidence before me that the plaintiff or anyone else has experienced a chilling effect as a result of the plaintiff's allegedly retaliatory termination. The plaintiff must do more than

merely argue, without any supporting evidence, that his termination is chilling the future exercise of First Amendment rights. I find that the plaintiff has failed to establish a threat of irreparable injury to support the issuance of a preliminary injunction in this case.

**B. The State of Balance Between the Plaintiff's Harm and the Injury That Granting the Injunction Will Inflict on the Defendants**

 The plaintiff has alleged a number of specific harms which I have found do not amount to "irreparable harm" for the purposes of his motion for a preliminary injunction. Also, I have found that the plaintiff has not adequately demonstrated that there has been a chilling effect upon his or others' exercise of First Amendment rights. The plaintiff claims that the defendants will suffer no harm if the preliminary injunction were granted, because the plaintiff's unpaid faculty appointment will pose no administrative or financial burden upon the defendants. The defendants respond with the argument that they will suffer harm if a preliminary injunction were to issue because an injunction would allow the plaintiff to "immunize" himself from the volunteer faculty guidelines and obtain an appointment that he is ineligible to receive. (Defs.' Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 34) (quoting *Wytrwal v. Saco School Board*, 70 F.3d 165, 171 (1st Cir.1995)). However, as the plaintiff rightly points out, it is not clear how this would actually harm the defendants, even if were true. Dean Armitage testified that the rationale for requiring volunteer faculty appointments in the faculty member's department of specialty or sub-specialty was to prevent departments from hiring their own 'consultants' from other disciplines instead of consulting with other departments within the medical school. (Hr'g Tr. at 359:15–360:20.) This rationale

seems to be inapplicable to the plaintiff, who has no board certifications in any discipline and who was working on a basic research project in the department of his faculty appointment. Also, it seems to me that the issue confronting the First Circuit in *Wytrwal* is not presented in the present case. *Wytrwal* was concerned with the possibility that plaintiffs who had prior problems with their supervisors could protect themselves against termination by engaging in constitutionally protected conduct. *Wytrwal*, 70 F.3d at 171. I find that the state of balance between the harms to the plaintiff and the defendants does not weigh either in favor of or against the issuance of a preliminary injunction in this case. Neither party has demonstrated the existence of any significant harm that would result from either the issuance or denial of a preliminary injunction in this case.

**C. The Probability That the Plaintiff Will Succeed on the Merits**

The plaintiff has argued that he is likely to succeed on the merits of three substantive claims. I shall review each of these claims in turn.

**1. First Amendment—Retaliation Claim**

 The plaintiff has alleged that his termination from the UNMC volunteer faculty was in retaliation for the exercise of his First Amendment rights. To prevail on this claim, the plaintiff must show that his speech was constitutionally protected and that it was a substantial or motivating factor in the defendants' decision to terminate his volunteer faculty appointment. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the plaintiff meets this burden, the defendants must then show, by a preponderance of the evidence,

that the plaintiff would have been discharged even in the absence of the protected activity. *Id.See also Hamer v. Brown*, 831 F.2d 1398, 1401 (8th Cir.1987).

█ The parties are in agreement that the filing of and participation in litigation challenging Nebraska's partial birth abortion statute constitutes constitutionally protected speech. However, the defendants argue that the plaintiff is unable to show that his participation in the "partial birth abortion" litigation was a substantial or motivating factor in the decision to terminate his appointment. The defendants argue that the temporal proximity between the Supreme Court decision in *Stenberg v. Carhart* and the plaintiff's termination is, by itself, insufficient to establish that the plaintiff's participation in that litigation was a substantial or motivating factor in his termination. The defendants refer me to a number of cases that provide some support for this position. *See O'Sullivan v. Minnesota*, 191 F.3d 965, 968–69 (8th Cir.1999); *Cromley v. Board of Education*, 17 F.3d 1059, 1068–69 (7th Cir.1994); *Hamer v. Brown*, 831 F.2d 1398, 1403 (8th Cir.1987); *Zar v. South Dakota Board of Examiners of Psychologists*, 976 F.2d 459, 465 (8th Cir.1992). Whether or not the defendant's argument is based upon solid legal ground, it appears that there is much more than mere temporal relationship between the resolution of *Stenberg v. Carhart* and the plaintiff's termination. The evidence I have summarized in section I above suggests that Regent Miller's calls for UNMC to sever its connections with the plaintiff were associated with the progression of *Stenberg v. Carhart* and its accompanying publicity. Miller expressed his concerns directly to Bob Bartee, who had connections with the volunteer faculty review process. The plaintiff received a termination letter that 1) may have been unique, 2) was drafted well before the

volunteer faculty committee's report, 3) was likely drafted without any knowledge of the contents of the committee's report, 4) implemented a faculty review policy that does not appear on the face of the committee's report, and 5) had been reviewed by the aforementioned Bob Bartee during some stage of its drafting. Also, Regents Miller and Skrupa took some degree of credit for securing the plaintiff's termination. The plaintiff was probably the only volunteer faculty member who was terminated who was participating actively in a basic science research program, making it unlikely that he would have been terminated absent his controversial "battle" with Attorney General Stenberg. Other productive volunteer faculty with appointments in areas other than the area of their specialty training, namely the members of the family medicine department appearing on the "B" list, were informed that they would be shepherded into proper appointments, not that they would be terminated. Also, as I noted in Part B above, the rationale for requiring volunteer faculty appointments in the faculty member's department of specialty or sub-specialty does not seem to apply to the plaintiff. The evidence supports a finding that the plaintiff's lawsuit challenging Nebraska's partial birth abortion statute was a motivating factor in the defendants' decision to terminate him from the volunteer faculty. The evidence also supports a finding that the volunteer faculty review process provided a pretext for the plaintiff's termination. I find that the plaintiff has demonstrated that it is likely he will succeed on the merits of his First Amendment/retaliation claim.

## 2. Conspiracy Claim under 42 U.S.C. § 1985(2)

█ The plaintiff has also alleged that the defendants conspired to terminate him from his volunteer faculty appointment in

violation of 42 U.S.C. § 1985(2). A conspiracy "to deter, by force, intimidation, or threat, . . . to injure such party or witness in his person or property on account of his having so attended or testified" in federal court forms a basis of a claim under § 1985(2). *Id.*

▪ In order to prevail on his § 1985(2) claim, the plaintiff must show that two or more defendants conspired together to injure him for participating in a federal lawsuit. *See Gometz v. Culwell,* 850 F.2d 461, 464 (8th Cir.1988); *Rutledge v. Arizona Board of Regents,* 859 F.2d 732, 735 (9th Cir.1988); *Wright v. Illinois Department of Children and Family Services,* 40 F.3d 1492, 1507 (7th Cir.1994). The defendants have set forth two arguments in support of their position that the plaintiff cannot demonstrate a probability of success on the merits on this claim. First, the defendants argue that the plaintiff has failed to allege with sufficient particularity and demonstrate with specific facts that the defendants conspired to injure him in violation of § 1985(2). *Gometz v. Culwell,* 850 F.2d at 464. The defendants have filed separate motions to dismiss, filings 30 and 39, which present arguments similar to the one raised here regarding the sufficiency of the allegations. With respect to the plaintiff's § 1985(2) claim, I have resolved these motions in the defendants' favor. This claim has been dismissed for the reasons stated in the Memorandum and Order on the Defendants' Motion to Dismiss and Motion for a More Definite Statement.

▪ Even if the plaintiff had properly alleged a § 1985(2) claim, the plaintiff has failed to demonstrate with specific facts that the defendants conspired to injure him. Presently, no evidence supports an inference that a "meeting of the minds" occurred between named defendants. *Rouse v. Benson,* 193 F.3d 936, 943 (8th Cir.1999). The evidence does not rule out

that such a meeting of the minds occurred. For example, there is evidence consistent with the theory that Regent Miller and Dean Armitage, perhaps through their communications with Bob Bartee, agreed that UNMC should sever its connection with the plaintiff. Also, email communications in evidence suggest that meetings of minds *could* have occurred between Regent Miller, Chancellor Maurer, and Regent Hassebrook. Generally, however, only one side of these email conversations is before me, and in the two emails in evidence that include responses from a defendant, there is no specific evidence of an agreement to pursue Carhart's termination. (*See* Pl.'s Ex. 19, 25.)

At this stage of the case, specific evidence of a § 1985(2) conspiracy is absent. *Gometz,* 850 F.2d at 464. I find that the probability that the plaintiff will succeed on the merits on his § 1985(2) claim using only the evidence now before me is next to nil. Of course, evidence not yet adduced may alter this "probability" significantly following a full trial.

▪ The defendants have argued that the intracorporate conspiracy doctrine bars the plaintiffs § 1985(2) claim. The intracorporate conspiracy doctrine holds that "a corporation cannot conspire with itself through its agents when the acts of the agents are within the scope of their employment." *Larson by Larson v. Miller,* 76 F.3d 1446, 1456 n. 6 (8th Cir.1996). The plaintiff responds that the intracorporate conspiracy doctrine is inapplicable in this case because a criminal conspiracy is alleged. In support of his argument, the plaintiff relies upon *United States v. Hugh Chalmers Chevrolet–Toyota, Inc.,* 800 F.2d 737 (8th Cir.1986), which involved a conspiracy to disconnect automobile odometers in violation of 15 U.S.C. § 1986, and *McAndrew v. Lockheed Martin Corp.,* 206

F.3d 1031, 1035–41 (11th Cir.2000), which will be discussed more fully below.

In the Eighth Circuit, the intracorporate conspiracy doctrine is applicable in cases alleging conspiracies arising under 42 U.S.C. § 1985(3). *See, e.g., Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir. 1987). The Eighth Circuit has yet to determine whether the doctrine applies in cases arising under § 1985(2), and other circuits are split on the issue. *Compare McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1035–41 (11th Cir.2000) *with Wright v. Illinois Department of Children and Family Services,* 40 F.3d 1492, 1507–08 (7th Cir.1994). I am persuaded by the Seventh Circuit's reasoning in *Wright,* and I see no reason to treat the various subsections of § 1985 differently with respect to the intracorporate conspiracy doctrine. The Eleventh Circuit arrived at its result by finding that a § 1985(2) conspiracy to deter an individual from testifying in federal court by force, intimidation, or threat necessarily alleges a criminal conspiracy in violation of 18 U.S.C. §§ 1512 and 371. *McAndrew,* 206 F.3d at 1035–36. Initially, *McAndrew* may be distinguished from the present case because Dr. Carhart has not alleged that there has been a conspiracy to deter him from testifying in federal court by force, intimidation, or threat. However, the plaintiff argues by analogy that his § 1985(2) claim necessarily alleges a criminal conspiracy claim under 18 U.S.C. § 241, and thus the reasoning of *McAndrew* should be applied in the present case. Initially, this strikes me as similar to an argument that a plaintiff's tort claim for assault necessarily alleges or entails a criminal assault. In *Hugh Chalmers,* the case upon which the plaintiff relies, the defendants appealed their *criminal* convictions under 15 U.S.C. § 1984, 18 U.S.C. § 2 and 15 U.S.C. § 1986. Quite properly, the Eighth Circuit found that the intracorporate conspiracy doctrine did not apply.

Similarly, if the case before me entailed a criminal prosecution of the defendants for violating 18 U.S.C. § 241, the intracorporate conspiracy doctrine would seem to be inapplicable. However, the present case does not involve a criminal prosecution.

The plaintiff's position is also problematic because it would require me to determine that the intracorporate conspiracy doctrine is inapplicable to conspiracies alleged under § 1985(2), even though the Eighth Circuit has found that the doctrine applies to conspiracies alleged under § 1985(3). *Garza.* The plaintiff has provided me with no basis for distinguishing § 1985(2) and (3).

The plaintiff would have me hold that § 1985(2) conspiracies raised by plaintiffs in civil cases "necessarily entail" criminal conspiracies under any number of statutes, possibly including 18 U.S.C. §§ 1512, 371, or 241, *and* that conspiracies under § 1985(2) and (3) are distinguishable in some relevant way that would prevent this holding from contradicting Eighth Circuit precedent. I find I must reject the plaintiff's argument that the intracorporate conspiracy doctrine is inapplicable in this case.

However, there is an exception to the intracorporate conspiracy doctrine where individual defendants are named and those defendants act outside the scope of their employment for personal reasons. *Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir.1987). Here, the evidence presently supports a finding that Regent Miller wanted UNMC to sever its connection with the plaintiff in part for personal reasons associated with his re-election campaign. There is evidence that the regents have no authority to hire and fire faculty at UNMC, which supports a finding that Regent Miller's efforts to sever UNMC's ties with the plaintiff were outside the scope of his employment. Bob Bartee tes-

tified that in the spring, Regent Miller's interest in breaking UNMC's connection with Dr. Carhart was not consistent with the best interests of the University and was probably motivated by personal political fear. (Hr'g Tr. at 225:8–226:21.) Bartee testified that later, however, UNMC and Regent Miller's interests regarding the plaintiff's faculty appointment became more closely allied. (Hr'g Tr. at 226:22–229:10.) I find that if Regent Miller is included as a co-conspirator, the evidence before me at this time could bring this case within the exception to the intracorporate conspiracy doctrine set forth in *Garza*. Therefore, the defendants' argument that the plaintiff's § 1985(2) claim is barred must be rejected.

Nevertheless, the plaintiff has not established that it is likely that he will prevail on his § 1985(2) claim, even if the claim had survived the defendants' motion to dismiss, because the plaintiff has not yet come forward with specific evidence of a conspiracy. *Gometz v. Culwell*, 850 F.2d 461, 464 (8th Cir.1988).

### 3. Substantive Due Process Claim

■ The third and final claim that the plaintiff has asserted in support of his motion for a preliminary injunction is based upon the plaintiff's patients' right to obtain abortions. The plaintiff claims that the defendants' retaliation against the plaintiff for providing abortions chills his abortion services practice, which in turn chills the plaintiff's patients' right to obtain abortions. In support of this argument, the plaintiff asserts that his patients' right to obtain abortions is protected under *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851–57, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and that his right to provide abortion services is pro-

tected under *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 427, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) *overruled by Casey*, 505 U.S. at 882, 112 S.Ct. 2791, and *Colautti v. Franklin*, 439 U.S. 379, 387, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).

There is presently no evidence before me that the plaintiff's abortion practice has been "chilled" in any way as a result of the termination of his volunteer faculty appointment at UNMC. Similarly there is no evidence that patients' right to obtain abortion services from the plaintiff has been interfered with. Also, at this time there is no evidence that any loss of prestige that might be associated with the plaintiff's termination has had any effect upon his business, much less a chilling effect of constitutional magnitude. Under the circumstances, the plaintiff has not demonstrated that he is likely to succeed on the merits of his substantive due process claim.

### D. The Public Interest

■ The plaintiff argues that the issuance of a preliminary injunction in this case will serve public interest because the public has an interest in protecting the constitutional rights of its members. *Reinert v. Haas*, 585 F.Supp. 477, 481 (S.D.Iowa 1984). The defendants respond with the argument that the public has an interest in UNMC's ability to effectively fulfill its responsibilities to maintain educational quality and to make employment decisions regarding its faculty. *Belk v. City of Eldon*, 228 F.3d 872, 880 (8th Cir. 2000). The plaintiff has demonstrated a likelihood of success on the merits of his claim that the defendants terminated him as a result of his involvement in *Stenberg v. Carhart* and the Nebraska partial birth abortion controversy. If the plaintiff ultimately prevails on this claim, it would seem to entail a finding that the employ-

ment decision exercised by the defendants was impermissible and therefore not consistent with the public interest. Also, the defendants have provided no evidence suggesting that the plaintiff's reinstatement to the volunteer faculty would interfere with the operations of UNMC. Under the circumstances, the public interest does not weigh in favor of the defendants' position.

On the other hand, neither does the public interest weigh in favor of the issuance of a preliminary injunction at this time. It seems to me that the public interest would have been served by the issuance of a preliminary injunction in this case if the plaintiff had shown that he or others have been experiencing a chilling effect upon their First Amendment rights due to the defendant's retaliatory termination of the plaintiff. However, since this showing was not made, I find that the public interest does not require the issuance of an injunction.

### III. CONCLUSION

All in all, I conclude that the balance of equities does not favor the granting of a preliminary injunction in this case. Of course, it may be that after a trial can be had, a different decision will be made as to whether the plaintiff is entitled to injunctive relief. However, at the present time there is no threat of irreparable injury to the plaintiff or anyone else should the issuance of an injunction be delayed until the conclusion of the trial. Although the plaintiff has demonstrated a probability of success on one of his claims, the absence of irreparable injury in this case precludes the issuance of a preliminary injunction. The notion that all four of the *Dataphase* factors must be considered when determining whether a preliminary injunction should issue can be misleading, for it is well established that under any test, the movant must establish the threat of irreparable harm. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d at 114 n. 9 ("Thus, the absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.")

**IT IS ORDERED THAT** the plaintiff's motion for a preliminary injunction, filing 2, is denied.